*Martin,* (Attorney-General) and *Winchester,* for defendant.

MAY 1798.

M'Mechen
vs
M'Laughlin's
executor.

———✁———

## COURT OF CHANCERY, MAY TERM, 1798.

### RIDGELY, *vs.* CAREY, Executor of M'KENNA.

THE bill in this case, (filed on the 24th of July 1798,) stated, that the complainant, some time in the month of December 1796, entered into a copartnership with *Parkin and M'Kenna* and *Jacob Franks Levy,* for the purpose of a trading voyage to the West Indies, on their joint account. It was stipulated that the complainant should go to the West Indies as supercargo, and part owner, and superintend the sales, and also purchase a return cargo. That the said *Parkin* and *M'Kenna* were to be the agents, and make sale of the return cargo for the use, and on the joint account of the said concern, whenever the said voyage should be complete and at an end. That in pursuance of such agreement, the said copartners did procure a schooner vessel called *The Nancy,* of the burthen of about 800 barrels, and had the same laden on their joint account; that is to say, the complainant was one third part interested, the said *Parkin* and *M'Kenna* one other third part, and the said *J. F. Levy* the remaining third part. That the complainant, in the said month of December, departed from the port of Baltimore in the said schooner called *The Nancy,* and did proceed to the West Indies, where he made sale of his outward bound cargo, and did invest the proceeds thereof in coffee, for the joint account of said parties, with which the complainant returned in

the said schooner, to the port of Baltimore, where he arrived about the 29th of April 1797, and did deposit the said vessel and return cargo in the hands of the said *Parkin* and *M'Kenna*, as agents for said concern, to make sale thereof for their joint account: That the said *Parkin* and *M'Kenna* did accordingly, as agents for said concern, in the month of May 1797, make sale of said cargo, the net proceeds whereof, after deducting charges, amounted to $ 36,651 71. That the said sales were made on credit, (except a small part,) and negotiable notes, due at different periods, were taken and made payable to the said *Parkin* and *M'Kenna* only. That it was agreed between the said copartners, that if any loss should arise by the non-payment of the said notes, or the insolvency of the drawers thereof, that such loss should be equally sustained by the parties in proportion to their respective shares of said adventure; and that the money arising from the said notes should be divided among the said parties, from time to time, as it should grow due and be collected: and to ascertain each party's share, the said *Parkin* and *M'Kenna* did give to the complainant, and the said *Levy*, their own notes for their respective shares, payable as the notes for the said sales should become due; and which said notes were to be returned to the said P. & M. in proportion as they collected the proceeds of the sales of the said cargo, and divided the same among the partners—And it was also the express agreement between the complainant, and the said P. & M. that the said notes, so given to the complainant, and which were only given to designate the amount of the complainant's share of the said cargo, and as a security for the same, should not be transferred or negotiated by the complainant, or converted by him to any use whatever, but to be returned again to said P. & M. from time to time as they collected the proceeds of said cargo and divided the same—and that no final settlement was to take place respecting the said voyage till the whole amount of said cargo had been collected, and each partner in the mean time was to run the risk of loss from bad debts in proportion to his interest in said adventure. That the said P. & M. have both departed this life, but the said M. was the surviving partner. That before their death they did receive and collect the sum of $ 16,050 97, from the said sales of said cargo. That at the time of their death there remained due for the said cargo notes to the amount of $20,600 74. That *Francis M'Kenna*, surviving partner, made and executed his last will and testament, wherein he appointed *James Carey* executor, &c. That the said *Carey*, as executor, has received the sum of $6,920 19

arising from the said notes, and there still remains due on account of said cargo $13,680 55, which the complainant expects the said *Carey* will receive from time to time as the said notes shall become due and payable. That the complainant hath applied to the said *Carey* for his third part of the money received on account of said cargo, according to the terms of the copartnership, and for a settlement of the same; but the said *Carey* hath refused to comply with the said request, alleging that the said P. & M. at the time of their decease, owed sundry sums of money to divers individuals on their own private account; and that by the testamentary laws of this state all creditors of a deceased person are entitled to a distributive share or dividend of his effects, and that no priority or preference could be given to the complainant in the payment of his claim; although the complainant charges, and so the truth is, that the net proceeds of said cargo do not constitute a part of the personal estate of the said P. & M. and therefore are not applicable by law to pay their private debts, it being copartnership property, and not the private property of said P. & M. And the complainant states, that he is entitled to his share of said adventure, and also to a settlement with the defendant, *Carey*, respecting the same, without any interference of the claims of the private creditors of the said P. & M.—*Prayer* for general relief, &c.

The Defendant, by his answer, admitted certain parts of the bill. He has no knowledge of any agreement about any loss which might arise by the nonpayment of any of the notes, or the insolvency of any of the drawers, or that the money arising from the said notes should be divided, &c. That he had been applied to by the complainant, &c. but he declined to comply with such request, being advised that the complainant was only entitled to a rateable proportion of the assets, which the defendant believed would be greatly inadequate to the discharge of the debts due by the said P. & M. And being also advised, that if the complainant ever had any lien on the said cargo, or the sales thereof, for his interest therein, that he had parted with, and relinquished such lien, by authorising a sale thereof to be made by the said P. & M. and taking and holding their negotiable promissory notes for the supposed amount of such interest in the cargo aforesaid, thereby creating the relationship of debtor and creditor, and consequently retaining no other claim than such as must be in common with the other creditors of the said P. & M.—And being also advised, that it was wholly immaterial whether any agreement had been made that the

MAY 1798.

Ridgely,
vs.
Carey.

complainant should refund or abate from the notes given by the said P. & M. to him, for the supposed amount of his interest in the sales, for his proportion of any loss on the cargo aforesaid, as the complainant would be compellable at law or in equity to return whatever excess he might receive under a mistaken conception of his interest in, or the value of the said cargo; and that the complainant, having elected to make the said P. & M. his debtors, that he could no longer consider them as trustees, or pursue in specie the said cargo, or the proceeds of sale thereof, to the injury of the other creditors of the said P. & M. more especially as the said P. & M. had during their lives collected $ 9,752 of the proceeds of the sale of the said cargo, and employed the same, and the same never came to the hands or possession of the defendant; and that the complainant, if entitled to any preference, could only be entitled to demand from the defendant a preference in proportion to his interest in $ 20,600 74, the sum due and remaining from the sales of the said cargo at the time of the death of the said P. & M. first deducting therefrom the amount of the complainant's proportion of duties. That the defendant hath not assets sufficient for the payment of the complainant's demand, if this court shall be of opinion that the complainant is, under the circumstances stated and disclosed, entitled to payment of his claim in preference to the other creditors of the deceased, and before the expiration of the time limited by law for the exhibition of claims against the estate of the said P. & M. and without notice to the other creditors of the said P. & M. to shew cause against such preference to the complainant's demand.

*Admissions of the parties.* That the complainant, before the death of the said P. & M. received on account of his part of the money arising from the sale of the coffee in the bill mentioned, and on account of part of the notes given by purchasers, the sum of $ 2,860 99; and that no more than the said sum hath been received by the complainant from the said P. & M. or from either of them, or otherwise, on account of the said coffee; and that there remains due to the complainant, from the said partners, the whole of his share amounting to $ 13,651 24, deducting the aforesaid sum of $ 2,860 99, and deducting also his proportion of duties. That this admission shall be considered by the chancellor to have the same effect and consequence as if the bill and answer were amended for the purpose of stating the facts herein stated.

HANSON, Chancellor. [October term, 1797.] "The said cause being submitted, the bill, answer, exhibits, depositions, and all other proceedings, were by the chancellor read and considered.

As this appears to be a case of the first impression, he cannot but regret the want of arguments from the counsel on both sides to assist him. He can find no decision which applies directly to this case; but he conceives that there is a sufficient analogy between it and cases of bankruptcy, and real assets, to enable him to form a just opinion. Indeed, the general principles of this court, which adopts substitution; contemplates trusts where none were originally intended; and, in short, does every thing not injurious to others, which appears necessary for doing justice between the parties to a suit, are favourable to the present complainant; whose application is, in effect, only for the purpose of obtaining justice, by pursuing the notes, arising from the sale of his property, and taken in the name of his agents, instead of his own.

It is certain that if the transactions, stated in the bill, and admitted in the answer, between the complainant and deceased partners, had never taken place, the creditors of those two men would not have been in so good a situation, as they will enjoy, after relief shall be granted to the complainant. How then can it, with reason, be said, that the relief will be injurious to those creditors?

Again—The defendant insists that the complainant ought to be on a footing with the other creditors, because he received for his share of the produce of the cargo the notes of the deceased, payable at the periods fixed for the discharge of the notes given to them by the purchasers of the cargo. But who ever intended, or supposed, that by taking a bond, or note, he should lessen the security he had before? Taking all circumstances into view, it is manifest that the object of the complainant in taking those notes, and the deceased in passing them, was merely to ascertain the share of the complainant in the proceeds of the sale. The passage of those notes, cannot, on any sound principle, make a difference in the case. The relation of debtor and creditor would have existed as well without them as with them; and, in fact, they only answered the purpose, for which they were intended, of ascertaining the complainant's share; and had they all been negotiated, and the deceased compelled to discharge them, the effect would only have been to prevent the present claim of the complainant; except indeed, that in case there shall prove to be any loss of the money still due from the purchasers, the defendant would have a claim against him; and except that there would be a claim against him on account of duties.

That the deceased received the money on part of the notes, can make no difference in reason and justice—

enough is left for the purpose of the complainant; and the assets for other creditors are the same, whether the deceased collected the money on that part, just before their death, or left it to the executor to collect; nor is it material to the creditors, whether the complainant obtains his share by taking the whole of some of the notes, or by taking a part of each note, provided that he sustain a proportion of any loss which may eventually take place. Had all the money been collected by the deceased, the complainant would indeed have been on a footing with other creditors, because there would be nothing specific to pursue. Let the case be compared to that of a man who sells land, and conveys it before the consideration is paid—If the buyer dies without having disposed of the land, and it is sold under a decree of this court for the payment of his debts, the original vendor is entitled to be paid before other creditors. But, if the deceased had conveyed to another purchaser, the original vendor is on a footing with other creditors, with respect to other lands left by the deceased.

Upon the whole, it is this, &c. adjudged, ordered and decreed, that the defendant, *James Carey*, as executor of *Francis M'Kenna*, shall bring into this court to be paid, or pay to the complainant N. G. R. the sum of $6,570 90, which is the proportion the complainant is entitled to receive of the money already paid by the purchasers of the cargo, deducting the money he hath already received, according to the admission filed, amounting to $2,860 99. And likewise, that when the defendant shall receive the money, or any part of the money still due from the purchasers, amounting to $4,248 27, he shall bring in or pay as aforesaid the complainant's just proportion thereof, which will be to the whole to be received as $13,617 24 is to $36,651 71.

If the whole of the notes shall be collected, there will be due to the complainant, for his just proportion aforesaid, the sum of $1,578 24, which with the aforesaid $6,570 90, and the $2,860 99 admitted to have been received by the complainant, amount to $11,010 13, the sum which the complainant was entitled to out of the proceeds of the sale, after deducting the duties, which were $7,017 20.

PETITION by the defendant for a rehearing, (filed 22d November 1797,) stating, "he conceives himself aggrieved by the said decree, inasmuch as the said decree having passed without argument, the defendant may be exposed to suits as executor aforesaid, and collusion may be imputed to him in acquiescing in the said complainant's claim. That by the said decree the defendant is

directed to pay to the said complainant divers large sums of money to discharge the claim of the said complainant, without regard to the assets which have or may come to hand, and the debts due by the deceased; and which claim the defendant is advised by the rules of this court and of law, ought only to be paid *pari passu* with the other debts of the said *Parkin* and *McKenna.*

May 1798.

Ridgely
vs.
Carey.

The defendant humbly conceives, that upon a rehearing of the said decree, he will be able to satisfy the chancellor that the decree as passed, ought to be changed and altered. That whatever may be the ultimate determination of the said cause, the defendant is anxious to have the same fully and justly argued and investigated, and and doth not desire a rehearing for any purpose of delay or procrastination. He therefore prays that a day to be assigned and appointed by the chancellor for rehearing and arguing the said decree, may be fixed, and he will, &c.

*Winchester,* for the defendant, observed, that he conceived that a rehearing of the decree referred to in the petition would be just and proper. He begged leave also to add. that at the time of the submission of the bill, answer and exhibits, in the cause, without argument, it was the impression and expectation of the counsel for the defendant, that if any doubt or difficulty should arise with the chancellor, and the same was communicated, that a day would be fixed and assigned for the argument thereof; and that the principles of defence assumed by the defendant, in his answer, would in case of doubt afford an opportunity for that investigation; and the object and intention of the submission was only to prevent delay and expense. That such decree as may be passed after argument would be satisfactory to the defendant and the creditors, while a decree passed without argument, and having the appearance of an admission of the said claim, would probably produce new suits, and delay the final close of the administration. He flattered himself that he should be able to shew, that by the decision in chancery upon the facts stated, the complainant is only relievable as a creditor, and that no specific right exists in him as a partner, or against the defendant as a trustee.

Hanson, Chancellor. The petition of the defendant, relative to the decree in this cause passed, was by the chancellor read and considered.

It appears to the chancellor, that notwithstanding the very short lapse of time since the institution of this suit, the defendant has done every thing which might

reasonably be expected from him, to have the cause decided on its merits. He has indeed concurred with the wishes of the complainant to obtain a decision, without delay, which would have been extremely inconvenient to the complainant, without the least advantage to the other creditors of the deceased; and, in so doing, he appeared to the chancellor to have acted the part of an honest, ingenuous, humane person. But so far was he from admitting the complainant's claim of a lien on the notes, given by the purchasers of the cargo, which remained undischarged at the time of the testator's death, that he expressly denied, in his answer, the equity of the said claim, and asserted positively the right of the other creditors.

The first intimation which the chancellor had of the existence of this suit, was received in the following manner: Three days before the date of the decree, the papers were laid before him, as ready for a decree. As the cause was not inserted in the list of causes, regularly set down for hearing, and marked "*submitted*," he certainly would not have proceeded to a decree if he had not found amongst them a positive *submission*, signed by the counsel on each side, which he could not consider otherwise than equivalent, in all respects, to a submission, on a regular calling in term time, of the list of causes set down for hearing at the preceding term.

No term of general use in the proceedings of this court is perhaps more generally understood than the term "*submitted*." It means, that the parties leave it to the chancellor to determine without argument. Like other terms indeed, it may be modified, or qualified by concomitant words, such as "submitted" on notes of the counsel "*filed*" or "*to be filed*." But never yet was the term "submitted" in this court, without such modification or qualification, understood to mean otherwise than that the party or parties who "*submitted*" dispensed with the benefit of argument.

The practice of the chancellor on the submission of causes, is generally known—He proceeds to examine the papers; if no doubt or difficulty occurs, he decrees without hesitation; if a doubt occurs, and he does not think proper to investigate the point without the aid of the counsel's argument; or, if on investigation, the doubt remains, or he thinks it more safe and prudent to learn in what light it strikes the counsel, he then lays aside the papers, and notifies the counsel of his desire to have the cause argued.

In the present case a doubt occurred on reading the bill and answer. He proceeded to an investigation,

and the doubt vanished. He then framed his decree, in which the principles of his decision are explained; and the defendant is directed to discharge the complainant's claim, partly out of the money which he has received since his testator's death on the notes which remained due at the death, and in which the chancellor conceived the complainant had a just right, and partly with the money, still to be received, on the notes remaining undischarged.

Now, supposing the chancellor to hear an argument of the case, and to retain his opinion, he does not perceive in what respect the defendant's situation will be better than it is at present; he will remain liable to every suit which may now be instituted against him, and he will be no more entitled to the protection of this court than he is at present. Let it again be repeated, that the cause has been decided on its merits; and that the defendant in his answer insisted on every thing which could fairly be urged in behalf of *M'Kenna's* creditors. For it is not even alleged that the amount of the complainant's claim is exaggerated, and it is only that which is called a preference that is complained of.

It would seem from the representation of the defendant's counsel, that a submission does not mean a waiver of argument by the parties or their counsel, but only refers the papers to the chancellor, with a view that he may suggest the points on which the decision is to depend. A very little reflection will satisfy, either that this cannot be the meaning of a submission, or that a submission is always improper. Suppose then that a submission does not authorise the chancellor to decree without argument, but only to suggest points; and if the counsel are at liberty afterwards to make other points, what is the effect of the chancellor's investigation, but to aid the counsel, or to give his mind a prepossession, or to expose him? If the counsel are *not* thus at liberty, is it not obvious, that if the true points should escape the chancellor the submission will have operated to defeat justice? In fact, the danger would be greater in the latter case than if the submission precluded the counsel from argument; for if that were the case, the chancellor might be expected to be far more careful in his investigation. In short, if a submission did not authorise the chancellor to decree without argument, or if after a submission and decree without argument, the counsel were considered to be as fully entitled to argue the cause as if they had not submitted, the chancellor would never again accept a submission. He knows a little of human nature; and he must be more than man, if he be not far more likely to form a just decision, after hearing the ar-

guments of ingenious and learned counsel on each side, than to retract an opinion given before he had the assistance of those arguments.

The chancellor has been thus full and explicit, because he feels himself called upon by the present application, either to justify his proceedings, or renounce his error. He wishes all the practitioners in this court to consider these remarks, and to weigh well the immediate effect, and the probable and possible consequences of the submission of a cause.

After all, the chancellor, under all the circumstances of this case, thinks proper to comply with the prayer of the defendant's petition; and it is accordingly adjudged and ordered, that this cause be reheard, and stand for hearing at the time fixed in the beginning of the present term for the hearing of causes."

The cause came on for argument before the chancellor at this term, May 1798.

*Winchester*, for the defendant. This cause having heretofore been submitted, and the chancellor having expressed his regret that he had not been furnished with the arguments of counsel, in the decree passed at October term; the increased probability of a great deficiency of assets to satisfy the debts of the deceased; the uneasiness of many of the creditors; and the solicitude of the executor that his conduct might be such as not only to secure him from loss, but censure; occasioned the application for a rehearing, which the chancellor has been pleased to order.

Strongly as the defendant's counsel was of the opinion, that the complainant's case was not sustainable, he confesses his confidence shaken by the opinion already given; but well knowing that the liberality of a great mind will examine its own decisions with all the severity which justice requires, he ventures to make some observations upon the case, in the same manner as if no decree had passed; and only hopes, that their prolixity, and the triteness of some of the remarks, will be excused on account of the importance of the sum in contest, and the principle to be established.

The facts in this case, so far as they are material to the decision, appear to me to stand thus:—*Parkin* and *M'Kenna, Levy*, and *Ridgely*, enter into a limited partnership, to wit: a joint adventure from Baltimore to the West Indies. *Ridgely* was to go supercargo, and have the direction of the voyage, until the vessel and cargo should return to Baltimore. It was expressly agreed, that the return cargo should immediately, on its arrival, be de-

livered to and sold by *Parkin* and *M'Kenna*, and accounted for to *Ridgely* and *Levy*, for their respective proportions, *after the amount of sales should be received.* Pursuant to this agreement, *Ridgely* delivered the whole return cargo to P. & M. (who had purchased *Levy's* share.) They sold the cargo, and took negotiable notes in their *own* name, but which are sufficiently identified to be the notes taken for this cargo. P. and M. executed notes to *Ridgely*, for his share, payable at the same periods as the notes received by them would fall due. Part of the notes received by P. and M. were paid, and part remained unpaid at the time of their deaths. P. and M. entered the cargo, gave bond in their own names for the duties, which have since been paid.

In considering this case my arguments will be reduced to the following positions:

1st. He who stands in the simple relation of creditor to another can have no relief which is not common to all the creditors.

2d. A person seeking a preference against the estate of a deceased person, must be entitled on the ground of a written security, from the usages of trade, or by operation of law.

3d. The right to demand the possession of specific property, or its product, depends upon the circumstance, that he who demands the possession of such property was the exclusive owner and possessor thereof, not having parted with the *right*, or made any special agreement relinquishing absolutely, or impliedly, the right to pursue that property or its product.

4th. Copartners in general trade, or a particular adventure, do not, as such, acquire the relations of debtor and creditor; but that relation is created whenever the adventure ends, and a balance is struck and promised to be paid, or any special agreement intervenes on which a legal remedy can be had.

If these principles are correct, as I shall endeavour to establish previous to the application of them to the facts in this case, it will not be difficult to shew that the complainant's claim is not tenable.

1st. *Position.*—This proposition is so clear, that to state is to prove it, but is important to mention it from its connexion with the other principles, and the conclusions which will be drawn in its application.

2d. *Position.*—Independent of the protection afforded to this principle by the general policy of our testamentary laws, whose primary object is to level all debts, it is grounded on the first principles of justice; and the general maxim that *equality is equity* is more strongly and justly applicable here than in ordinary cases. Commerce has its basis on credit—Credit results as much from the

possession of goods of which merchants are the apparent owners, and bills or notes shewn in their *own names*, as from good conduct and real wealth. On these grounds commercial confidence is acquired. What destructive consequences would not result from discriminating the *nature* of debts, and permitting to the party himself to secure, or deducing legal consequences which should secure, a preference to a particular description to the exclusion of others? It is to guard against these consequences that our insolvent acts interdict, under such severe penalties, the *creating* of preferences by the party. *It is* with the same view that our testamentary laws prohibit executors or administrators from *giving* a preference under the penalty of a *devastavit*. It would therefore seem, that a case which is bottomed on principles destructive of commercial faith, opposed to the general principles of equity, and subversive of the general policy of our laws, is not entitled to any favour. No person can be deemed a creditor but from some valuable thing given or loaned. The meritorious nature of some species, of some considerations, are such as to justify securing a reimbursement, and this may eventually amount to a *preference*. As in the cases of a loan of money to establish a house of trade, or the gift of the use of a capital for a limited time to support its sinking credit, it is proper to secure a repayment or return of the thing, or its value. The law therefore permits its being secured by mortgage, or other *written engagement* tantamount to a mortgage, and this security could not be effected by a subsequent insolvency. This no policy opposes—It is founded on principles necessarily resulting from *property*.

When a party possessing property refuses to comply with his engagements, suffers himself to be sued, and the issue of a suit determines the justice of the claim against him, it would be the height of iniquity to say, that no recourse should be had to the delinquent's property. A lien is therefore created by operation of law.

The usages of trade also, on principles of *general benefit*, create liens in certain cases. As it will be attempted to bring the complainant's case within some of these cases, let us discriminate them with precision.

The first case is that of a factor who has a lien on any property *of the principal* in *his hands* for securing *disbursements* on such goods or a general balance—2. *Burr*. 936. In this case it is obvious, that the lien was originally introduced to avoid circuity of action, and from analogy to the doctrine of set-off.

The next case is that of a manufacturer who has a lien on the goods *in his hands* for the value of his labour, &c.—1 *Atkyns*, 235. 4 *Burr*. 2214.

Those decisions are grounded on the effect of a bailment for a special purpose, by which the bailee acquires a special property, and which can only be defeated by payment of the debt.

The next case, in which may be indiscriminately classed inn-keepers, carriers, &c. depends on the *common usage* in their favour. It is apparent that liens are in these cases exclusively *against* the owners of goods, but I admit they apply *e converso* in nis *favour* against any person whom he can make out to be his *bailee* or *trustee.*

I also admit, that the claim of the complainant rests on a commercial *transaction,* but the usage in *favour* of his claim is denied, and it is *not proved.* But admitting it in the same manner as if the *usage existed* and was proved, (which are denied,) I insist, that wherever any *special agreement intervenes* upon which the party in possession of property or its proceeds promises and becomes bound to pay, the special agreement excludes the effect of usage and precludes any *lien.* As in the case of *Brenan* and *Currant, Sayer's Rep.* 224—A farrier, who agreed for a stipulated sum to cure the plaintiff's mare, which he performed, but refused to deliver her up until paid—it was adjudged that the special agreement superseded the right which the law would otherwise give to retain, and that his only remedy was by suit *on the agreement.*—*S. P.* 4 *Burr.* 2216, 2217. 2 *Roll. Ab.* 92, tit. *Justification pl.* 1, 2—*See also* 2 *Term. Rep.* 100.

Another exception to the application of the doctrine of liens, is found in the case where the *possession* and *right* are changed. This exception results necessarily from the nature of the right, and is implied in the very definition of the term—"Lien is a tie or hold upon goods or other things which a man has in his custody." There cannot therefore, in the very nature of the case, be a lien, tie or hold, on that which a man has *not* in custody—for *without* custody there is no lien—2 *Vern.* 117. 1 *Atkyns,* 234.

Again—There is no lien where the *particular* transaction shews the parties intended there should be none, by adopting or substituting and looking to personal credit and *relying on it.*—4 *Burr.* 2223, the latter part of the case *Green et al.* vs. *Farmer, per Ld. Mansfield* and the court. And on this case I will now observe, with great deference, that the argument "that no person ever " intended or supposed, that by taking a bond or note, " he should lessen the security he had before," is extremely fallacious, for it is tantamount to saying, the law shall never operate on an act unless the parties intend it; whereas it is certain, that the moment an *act* is done, the legal qualities incident to that act take their

existence, whatever the parties may suppose; as for instance, a deed may operate as a *release* or *a confirmation*, though the parties only intended or supposed it would act as a *bargain and sale*, and a variety of other similar cases which occur to the mind at once.

It is only incumbent n the defendant to shew, that the complainant's case is not within any of the general cases of lien, or that it is embraced by some of the cases which form exceptions to the general rules.

It appears to me, that the only ground upon which the complainant can pretend a right to a preference, is on the ground of his *original* interest; and that the rights consequent thereto, substantially remain after a sale where the proceeds can be traced. I shall obviate this ground under my

*3d Position.*—I admit that the owner, and exclusive proprietor of goods, by confiding their *possession* to another does not part with the right. Possession of any kind, it is true, is *prima facie* evidence of right; but it may be *precarious*; as a deposit it may be *criminal*, as of a thing stolen; or it may be qualified as things in the custody of a servant, carrier or factor. The *mere possession* of a chattel therefore, neither gives or destroys title. The complainant, however, cannot deny, that when an owner voluntarily places goods in the hands of a factor for sale, and a sale accordingly takes place, the purchaser acquires an undoubted right; the property and possession both change. It is also unquestionable, that after a sale, and the property is converted into *money*, the first owner can only be esteemed a creditor, and is entitled to no preference.

Before a sale, where the depositor or principal is the *sole owner*, he may pursue his property *specifically*; but that is only in the case where the depositor might have retained the possession himself, and where the precarious possession is derived *from* and held in trust *for* him. And in no case, where the person in possession has it as a *part owner*, or in virtue of an interest in such property, and in consequence of a special agreement, can any other person, having a *less* or even an *equal* interest with him in that property, pursue that property, or deprive him of its proceeds, and *a fortiori* the proceeds of sale cannot be specifically pursued.

Wherever two or more persons have a common interest, whether in equal or unequal shares, and one of them has the *sole* possession, that possession must either be lawful or tortious as it regards his cotenants; if lawful, it must be because of consent; and in such case, after the property is sold, the relation of debtor and creditor is immediately created, and the only remedy is by action

of assumpsit for his share or interest, and in such action mutual demands may be set off; 2 *Burr.* 986-7; for after such agreement the right to pursue the property specifically, if it ever existed, is gone. When there is no right to demand the thing, it would be superfluous to observe there can be no right to demand its product. Or, the possession is tortious, as being adversary to and in exclusion of his co-owners. Now in this case it is clear, that there is no legal remedy by which he could be ousted of this possession.—*Salk.* 290, *Brown vs. Hedges*—but if he sells, and receives the money, then the injured co-owner may have his remedy by action of trover, *(Co. Litt.* 200. a. *Cowper,* 375;) or he may wave the tort and have assumpsit for his share of the money.—*Doug.* 137, *(*132,*) Longchamp vs. Kenny.* Does not the existence of these remedies destroy the idea of a specific right? How are the facts? By common consent P. & M. had the entire possession of the cargo for sale—Their possession was rightful—*Ridgely* never could have deprived them of it against his own agreement and consent at law or in equity. He could not have followed the property. He cannot pursue the notes; for by his *own agreement* he was to receive his share *in money* (not notes,) at their hands. Why was this agreement made? Because he looked to their *personal* credit. If he had not, each would have taken notes *at the time of the sale* from the purchaser for his share. What then was *Ridgely's* demand against them, and in what character? It was for a specific sum, when received by them, and in the character of creditor. And the *whole transaction* clearly proves, that *Ridgely* never thought he had any right to follow the notes taken by P. and M. in their own name with his knowledge; and also clearly shews, that when he took *their* notes to ascertain *his share,* he relied on their stability, integrity and credit, for the payment of their notes. Where then is any ground to establish a lien to the injury of other creditors? It is said his case is hard—but the case of every man, who is likely to lose money honestly due, is likewise hard.

It is in vain they claim the aid of a court of equity; for in cases of equity the hardship must be *divided;* and his right is only a legal one—See the case above cited in *Roll. Ab.* and 2 *H. Blackstone, Slubey vs Heyward.* That liens are *clear legal rights*—and with a remedy existing at law equity ought not to interfere, when the effect of that interference will be to swallow up the estate for *one creditor.* If relief to the extent he now claims cannot be had at law, it is because he is not entitled to it in justice, or from the usages of trade.

*4th. Position.*—The community of interest between partners during the continuation of that interest, greatly abridges the remedies which strangers have against each other. Their relation is sufficiently described by saying, that *as partners* they are not creditors of or debtors to each other. But when the partnership ends, and a specific sum is ascertained to be in one partner's hands belonging to the other, which he engages to pay, and which engagement the other accepts, his *specific rights* as a partner end, and the common relation of debtor and creditor is created.

2 *Term Rep.* 479, *Foster* vs. *Allanson.* The plaintiff and defendant had been copartners, but dissolved their connextion; an account was stated of a balance struck in favour of plaintiff which defendant promised to pay—Action of assumpsit was brought, and ruled to lie—S. P. *Moravia* vs. *Levy,* 2 *Term Rep.* 483.

So also if a partnership is dissolved when goods are on hand, and one partner is directed to sell them, and promises to pay, when the money is received, the other's share, the partners who accept this promise lose all claim to the goods and their proceeds specifically, and can *only* have remedy *on the promise*—2 *Burr.* 936-7. The right to follow goods or their product specifically, being lost when a promise intervenes, in the same manner as a lien would by such promise be destroyed.—*Sayer's Rep.* 224. 4 *Burr.* 2216. Now, though the relation of debtor and creditor may be said to exist independently of such promise, yet, according to the principle of the case, *Green* and *Palmer,* in *Burrow,* it is the acceptance of, or reliance on that promise, or the credit of the promisor which destroys the specific right—And which is precisely the case of the complainant, who accepted the notes of P. and M. and relied on their *credit.*

Let us now examine the cases of real assets, and cases of bankruptcy, which are considered analogous to the present, and see in what they differ. The cases where arrears of purchase money have decreed to be liens on the land sold, do not appear to me to stand on similar grounds with this case. A bargain and sale must be for money *paid,* otherwise it is *in trust* for the bargainor. If an estate is sold and no part of the money paid, the *vendee is a trustee.* In such cases therefore, from the foundation of the court of chancery, there must be a lien on the land itself, as the land is the trust fund, and that lien will be protected against a subsequent purchaser *with notice.* The lien springs from the *sale* which *ipso facto* creates a *trust* for arrears of purchase money; this trust like all others is modelled as justice may require.

But how different is the case of personal chattels? On the sale of the chattel there is *no trust* created. The obligation in law and morality is to pay the price.—The thing can never be specifically followed for its price. The very moment the sale is completed, the right is vested in the purchaser. A right to the price is vested in the vendor. In the hands of the purchaser himself, still less a third person purchasing with notice, it cannot be pursued. In every circumstance of the two cases therefore, so far from resembling, they are opposed. How destructive would it be to commerce if similar liens existed? But even in the case of land where act of sale creates the body of a trust, the lien and security are lost by agreements much less important than those which took place between P. and M. and the complainant.

1. *Eq. Ab.* 142, *pl.* 14—The simple circumstance of taking a note for a part of the purchase money, by introducing a *personal responsibility,* destroyed the *lien.* This case is recognized in the late case of *Fowell & Heelis.* 1 *Bro. Chy.* 422, and is precisely the principle of the decision of *Lord Mansfield* in *Burrow,* and the determination in 2 *Term. Rep.* 100. Indeed, in all the cases where taking bonds and notes, &c. have not been held to destroy the lien, it has been owing to this circumstance, that some of the title papers have been kept back, or the *estate* was not completely assured to the vendee.

If so small a circumstance shall destroy liens in the case of lands, and there is, as the complainant's counsel supposes, any analogy between that case and the case of merchandize, the circumstance of the agreement that P. and M. were to *sell, collect* and *pay,* and executed their notes to the complainant for his share, by which, if they had survived their personal credit only, could have been resorted to, and neither the notes or property specifically pursued. proves conclusively, that P. and M's. death cannot entitle the complainant to any preference against the executor of the survivor; nor is there, when fairly considered and applied, more force in the cases of bankruptcy, which have been considered, to favour the complainant's claim. The principle of these cases are found in the cases *exparte Deeze; exparte Ockenden; and exparte Dumas,* in 1 *Atkyns.*

As these cases in principle and facts are so nearly similar, I will only consider *exparte Dumas,* 1 *Atkyns* 250. S. C. 2 *Vez.* 582. It is briefly this—*Dumas & Co.* not long before the bankruptcy of *Julian & Co.* drew bills of exchange upon the *Julians,* with a particular order as to the account to which they were to be placed. They were accepted and promised to be placed as directed.

Other bills were drawn to reimburse the first; the first bills were protested and returned, and the *Julians* became bankrupt; 580*l.* of the latter bills remained unnegociated, and were specifically claimed.

It is obvious that the great direct inquiry in that case, was on the fact, is the property changed? And the inquiry whether the bankrupts were trustees or factors to the petitioner? And the material questions were therefore similar to the leading question in this case. The petitioner's counsel did not pretend to claim for more than the *unsold* bills, and claimed to that amount only, on the principle that the property had never been changed; and the court only sustained a claim to that amount. *Julians'* never had any interest, or share, or concern, in those bills, on their own account. The whole belonged to *Dumas,* & *Co.* They were clearly *agents and trustees.* The possession of the property was exclusively derived from the petitioner. *Julians'* had no right to the possession independent of *Dumas's* consent. The *property* itself was specifically found; the *ownership* was in them; *Dumas's* had only a *precarious possession.*

But *Ridgely* was never more than a part owner with P. & M. They did not derive their possession *from him,* but had it as *owners* and in virtue of *the preceding agreement.* He could not, as I have before shewn, ever have deprived them of their possession. Against them therefore, supposing the dispute to have arisen in their lives, what was his remedy? By bill in chancery for account, and a decree for payment, or an action at law on their notes, or on the promise to pay when collected. Upon either of these remedies what would have been his relief? A decree or judgment for a specific sum. He would then be a creditor for that sum. If during their lives, remedies existed against them *only* as debtors, and the complainant would only have been protected as a creditor. The circumstance of a death cannot alter their relation.

The case cited in *Vezey* and *Atkyns,* of a determination in the common pleas, that notes taken for sales might be specifically pursued, applies to a case where the facts must have been similar to those in *Dumas & Julians;* and the notes spoken of, *Bank* notes, which pass by *delivery;* for courts *of law* have no power to compel the endorsement of promissory notes, and otherwise the relief would be nugatory; for without an endorsement the promissor would not be justified in paying, nor could he be compelled to pay his note to any other than the party named *in* the note.

It would be unnecessary to multiply references to cases which have arisen under the English statutes of bankruptcy, for they are all similar in principle to the

leading case of *Dumas* and *Julian;* are embraced and distinguished by my observations on that case; and are moreover subject to this general remark, that as the English statutes operate only on the bankrupt's *own* estate, no question can arise unless the property be on hand specifically, or in notes taken in the *name* of the principal. But against the bankrupt's estate no creditor has any preference; and it is wholly immaterial whether his estate consists of money, or notes taken *in his own name,* being the amount sales of property of others; for it is only the *property of another* in the bankrupt's hands which can be pursued, and notes are not, and never were, the principal's property.

Liens created by the usages of trade, are to secure disbursements made on the *credit of particular* goods; and are very different from the leins which result from ownership. None of the first description embrace the complainant's case, for it is certain he trusted to the credit and stability of P. & M. He could not possibly have contemplated a security in the property which was *sold* with his consent. He could not have trusted to the *notes* to be taken from the purchaser, because they were authorised to take them in their own name, and could have negotiated or disposed of them at pleasure. He did rely on their own *notes* which he took, and on their commercial credit and character. The complainant *expressly states* that he was to receive *money,* not a share or part of the property or notes; calculating on that, his case is within the determinations in *Sayer,* and 2 and 4 *Burrow,* before stated. And I have before shewn, that as *part owner* he has no lien, because he could not have followed or taken possession of the property.

It is said, that the complainant's claim is more favourable, because he is only pursuing notes arising from the sale of his property taken in the name of his agents instead of his own. But I have already shown, that the facts in this cause are the reverse of those on which this reasoning would apply; for they were not to account as agents, they gave their notes as *debtors.* I admit, that on the principle of substitution, chancery contemplates trusts, to do justice where it cannot otherwise be obtained, though the parties did not think of a trust; but that can only be in the case where the parties have done no act to prevent the implication of such trust, for the trust can only be implied; and where that implication is rebutted by circumstances, which shew that personal credit, a special agreement, or the like, was relied on, the court would not imply a trust, for the ground of implication fails. If, as he might readily have done, the complainant had negotiated the notes of the deceased, would

there be any implication of trust in favour of his indor-see? Surely not. Yet the principle of substitution applies *equally* to such an indorsee as to the principal. The truth is, that in a case of this kind, the principles of substitution are analogous to the doctrine of liens; and where personal credit intervenes, neither is applicable. It is immaterial with what view the complainant took notes, whether barely to ascertain his *share*, or for *negotiation*, for the act of taking them destroys the implication in complainant's favour, and introduces new rights, and legal remedies, and that alone destroys liens and trusts—4 *Burr.* 2223; but the reasoning which goes to establish a right to a share in some, or to the whole of some of the notes, appears to me equally inconsistent with commercial policy and legal decisions.

The moment the notes were issued, a third person, the maker of the notes, became interested. He executed instruments, which from their form and general usage, imported negotiability; would pass from hand to hand in common transactions nearly as money; and were immediately discountable. When negotiated they were unimpeachable. If at law or in equity other persons are admitted to shew themselves interested than those appearing on the face of the instruments themselves, there is an end to negotiable instruments; for on the very same principle that the complainant's right to a share in *one* note is conceded, he would become entitled to an injunction to restrain the payment to any other than himself—or if to the whole of one note, to a remedy for its recovery. Who would sign a note to be subject to such endless litigation as might be the result of contending claims and opposing interests? of endless bills of interpleader? Can there be different rules at law and in equity on this subject? Is there a clearer axiom than this—It is only the parties, or executors or administrators of parties, named in a note or bill of exchange, who can claim or be sued for money? Now what rational difference is there whether P. & M. in their lives had received the money on these notes, and *no other* could have received the money on the notes? or whether their executor, who to all intents and purposes represents them, legally and equitably receives it? he receives the money in virtue of his *office of executor, no other* can receive it. He receives it as property which belonged to the deceased. It is conceded that *Ridgely* never could have pursued it against them, and it seems very strange, that if, during their lives, he could neither have prohibited their receiving it, nor have pursued it when received, that his rights should vary when the claim is against one who stands in *their shoes.* Nor

is 't true that the assets would be the same to other creditors if the money had been collected before their death as now, if the complainant succeeds against the unpaid notes; for it is acknowledged, that in the first case he must come in as a common creditor, and in the latter he claims a preference.

As to such parts of the notes as were collected by the deceased, the claim of the complainant must *at all events* sink to a level with that of the other creditors; for the complainant's claim is on the *notes,* or the *proceeds of each note specifically;* of those *which remain* he was only interested *one third,* and as his claim is *specific,* there can, upon no principle, be an extension of it because of his being a creditor.

If my principles are correct, that the relation of debtor and creditor was created, or even if that relation was not created, and independent of it a lien would have existed, that the *special* circumstances of *this* case prevent such lien; or, even admitting that under such circumstances as those existing in the present case, a lien would exist between a factor and a consignor, there can be no lien in any case between partners where one fairly possesses and sells the stock and gives his note or bond to the other for his share; and I think the strongest reasons of policy and justice, and the most solemn determinations support them. The complainant can only be admitted to come in, in common with the other creditors.

*Ridgely* for the complainant—Before I advert to the arguments of the defendant's counsel, it may be proper to state several facts, which have been established by conclusive proofs in this cause, *more fully* and *particularly* than the defendant's counsel hath done; there being some circumstances which are held *material* in the decision of the case, and which appear to have been totally omitted by him in his statement.

By the testimony of *Levy,* it appears, that a copartnership was entered into between the complainant, *Parkin & M'Kenna,* and *Levy,* for a trading voyage to the West-Indies. *Ridgely* was to superintend and conduct the whole voyage, have a commission of 5 per cent on the sales of the outward bound cargo; and 2 1-2 on the return cargo; that the return cargo was to be consigned to P. & M. *"as agents for the concerned."* That they have received it *"as agents by agreement,"* and have rendered an account, *" of their agency"* stating the said cargo to be sold on credit, for notes, *"on account of the complainant, Levy, and themselves."*

It also appears, that if any loss was sustained by the non-payment of the notes, *it was to be borne equally by all the parties interested.* That P. & M. did give their

notes to the complainant for his proportion, payable at the periods the *notes to them* for the cargo (and which they took as agents,) became due. That they were not *to be answerable* for the amount of notes so given by them further than *they should collect from* the sales of the cargo.

That no *final settlement* was to take place till the monies due for the cargo were all collected, and that each partner in the meantime *was to run the risk in proportion to his interest* in the cargo. That part of the notes, arising from the cargo, were collected by P. & M. before their death, *as agents*, and that the residue hath been since received by the defendant, as executor of the surviving partner; the said notes (unpaid) being held by P. & M. at their decease, *as agents for the whole*, and at *the joint risk* though payable to them in their own name.

On the aforegoing statement of facts, several questions have been urged by the defendant's counsel, which will require both time and trouble to answer, arising more from their prolixity than from any other source.

1. The *first position* laid down by the defendant's counsel is, "that he who stands in the simple relation of creditor to another, can have no relief which is not common to all the creditors."

I shall agree with the defendant's counsel, that if the complainant, in the case before the court, founded his *claim of preference* on the ground only of his simply being a creditor of P. & M. in equal degree with others, that his claim is not supportable, and that the bill ought to be dismissed; for whenever it happens that all creditors are *on an equal footing*, equity *knows no priority*, and makes no distinction. But the case before the court, is far different, as I hope to demonstrate in the course of my argument.

2. I will now consider the *second question*—that "a "person seeking a *preference* against the estate of a de-"ceased person, must be entitled either on the ground "of a written security, or from the *usages of trade*, or "by *operation of law*."

In investigating this position, the defendant's counsel has blended subjects, as being illustrative of the question in debate, which are totally dissimilar in principle, and inapplicable in point of analogy. He premises his remarks with the observations, that "*equality is equity*"—"that commerce has its basis on credit"—that "credit results from the possession of goods, of which "merchants are the apparent owners, and bills and notes, "shewn in their own names, as much as from real "wealth." "That our insolvent laws guard against "creating preferences—that testamentary laws prohibit

"executors from giving a preference," &c.—And thence he would infer, that the present case is attended with some of the above circumstances, and "that a case bottomed in principles destructive of commercial faith, "opposed to the general principles of equity, and sub-"versive of the general policy of our laws, is not entitl-"ed to favour."

The defendant's counsel hath certainly not attended to the facts in this case, as proved, or the objects of the complainant's prayer for relief, or he would not have pronounced that his case, if established, would prove destructive of commercial faith, opposed to the general principles of equity, or subversive of the general policy of our laws.

Let us see wherein the truth of this case consists, and what the complainant requires. It is no more or less than this—that in the event of bankruptcy or insolvency, where property is to be divided among creditors, *that copartnership properly should be first applied to pay copartnership debts*; and that *private* debts should be postponed to *copartnership* debts, when copartnership property constituted the only fund out of which payment was required. If this application had been made, to pay the complainant out of P. & M's *separate property*, either as a *company*, or *individually*, the observations of the defendant's counsel would certainly have weight. But what does the complainant seek for? only to be paid his *claim against* the *company* out of the *company's effects*; that is, that the cargo held in company by the complainant, P. & M. and *Levy*, and *i's* proceeds, (*not converted and reduced into money*) should not be considered as the *sole property* of P. & M. and divided among their private creditors, but that it should be first subject to the claims against the copartnership, then *divided*, and the dividend of P. & M. only subject to the claims of their private creditors.

That this is conformable to commercial usage, and agreeably to the rules which prevail in a court of equity, will be readily admitted, by adverting to the following authorities—2 *P. Wms.* 501. 2 *Vern.* 706. 1 *Atk.* 98. 1 *Eq. Ab.* 55. 2 *Bro. Chy.* 15.

Let us now see in what respect this case is bottomed on principles destructive of commercial faith, is opposed to the general principles of equity, or is subversive of the general policy of our laws.

Assertions are easily made, and are as easily denied; but to support positions that are contrary to universal and received opinions, and are opposed to establish authorities, it is requisite they should be attended with reasons that carry conviction to the mind. And let me

ask, are not the very vitals of commercial credit wounded if the complainant fails? Is it not admitted, on all hands that the fund, out of which we pray relief, was partnership property.

If then the private debts of P. & M. are to be paid out of this *company property*, what person would risk his property in copartnership with another, if private debts were admitted to swallow up *the company effects?*

But it is urged, that credit results from the possession of goods, of which merchants are the *apparent* owners, and from notes, shewn *in their own names*, as much as from real wealth.

Credit and confidence, in general, result from the good opinion we have of the integrity and prudence of our debtors; and if the position advanced by the defendant's counsel is to have any weight, it would follow as a consequence, that whenever a factor died or became insolvent, *all the property* in his possession, of every description and kind, let it belong to whom else it might, ought to be devided among his, the factor's *private creditors, he being in possession and consequently apparent owner.*

It is said, that our insolvent laws guard against *preferences*; it is true, and I admit the application of the rule in its full force, when the private effects of an insolvent are to be divided among his private *creditors* in *equal degree*. But if the insolvent retains effects in his hands as *a factor* or *trustee*, and *belonging* to others, or holds copartnership effects, our insolvent laws do not say that property or debts, under such circumstances, are to be distributed among such insolvent's private creditors; the restrictions contemplated by our insolvent laws, embrace only the private property of the insolvent, not property held by him either in *trust*, as *agent* or as *copartner*, except his own share, after the copartnership debts are paid. The trustees of an insolvent have no power over *such kind of property*.

It has been observed, that our testamentary laws prohibit executors from giving preference among creditors, under the penalty of a *devastavit*.

How, let me ask, can the case of a deceased person, whose *private property* is to be divided among his *private creditors*, be compared to the case before us? The complainant does not require to be paid out of P. & M's. private assets, he claims a *preference* out of the copartnership property; and if that was not sufficient, he would then be on an *equal footing for the balance*, with the other creditors of P. & M. Was it so known, that an executor of one copartner was justified in applying the property or debts of a company to satisfy the private claims

of the deceased? How then can the *insolvent* or *testamentary* laws of this state be wounded by a decree in the complainant's favour when his case is no ways analogous? And can it be said that the *general principle* equity is opposed to his claim, when it is admitted on all hands, that the fund out of which he seeks payment would have been *his own* exclusively, as *surviving partner*, if the coffee had not been sold, or if it had been sold, and no notes had been taken from the purchasers for the amount? For the account of sales rendered and filed in this cause ascertain the fact that the cargo was sold, on account of *"the complainant and others, the copartners."*

Would it not be contrary to the general policy of trade, and repugnant to justice too, to say, that A. B. & C. should be paid out of property belonging to D. in E's hands, as *agent* or *factor*, because E. was indebted on his private account to the said A. B. & C? Surely it would.

The defendant's counsel hath stated a case or two, where *preference* is admissible even by the bankrupt laws; as for instance—"a loan of money to establish a house of trade, may be secured by a *mortgage* or *written engagement;* but this rule only applies to creditors of a bankrupt, *pari passu.*"

A case is instanced, when an execution is issued against a person, and his property seized, and it is called "a lien created by operation of law;" but let us enquire, suppose this execution was laid on *copartnership* property, for the *private* debt of one copartner, would a lien be created on the whole copartnership property in favour of the judgment creditor? I answer, No. *Vide* the cases, 2 *Lord Raym.* 871. *Salk.* 392. *Cowp.* 449. How then can it be contended, that the *private* creditors of P. & M. have an *equal lien* on the property of *Ridgely, P. & M.* and *Levy,* with the claimants, on the *latter concern?* If this doctrine could be supported, the creditor of *one* copartner, on a judgment, might seize the *joint* effects to satisfy his claims; for such would be the result of a decree, saying that the *private* creditors of P. & M. were equally entitled to be paid, as the complainant, for if this court should so decree, surely an execution against P. & M. in their lifetime, would have equally affected this property; and that such doctrine is not admissible, the cases already referred to ascertain.

It has been urged, that whenever a *special agreement* intervenes it excludes the effects of a lien; and the case of a farrier, as reported in *Sayer's Repts.* 224, is referred to. If the decision of that case rested on a ground similar to ours, it might easily be ascertained, by adverting to the proofs in the cause, that the *special agree-*

*ment* between the parties directly supports the complainant's case. What was it? That the notes taken by P. & M. were to be held by them, at the *joint risk* of the concern. That the notes given by them were only to *ascertain the portions of each partner*, and not to be negociated. And that no final settlement was to take place till all the notes for the cargo were collected.

The case of *Dumas vs. Julian* in 1 *Atk.* 234, when attentively considered, will, I think, fully establish the doctrine contended for by the complainant. It shews, that notes and bills, put into the *hands of an agent*, although actually *indorsed over* and *made payable* to such agent, if they remain unnegociated, may be pursued by the principal, *and that he has a lien thereon.* The Lord Chancellor in considering that case, declared that it was a question of great moment; "*That the property* of one man should not be *dissipated to answer the debts of other men*; that it was the policy of the bankrupt laws to put creditors, as near as may be, on a level, but that must be done only with regard to the bankrupt's own estate."

And in this very case, the chancellor referred to a decision in the court of common pleas, where it was determined, "*That notwithstanding the goods so consigned were sold, yet as the factor took notes instead of money for them, that the principal was entitled to the notes, and not the creditors* at large."

The bills remitted by *Dumas* to the *Julians*, were not drawn by them, but *endorsed over*, and were negociated, so that they might have *been paid away* as fully as P. & M. might have paid away the notes in question.—If they had done so, I grant we could not have pursued the notes in the hands of a *third person;* but the specific notes, which remained, being *unpaid and undisposed of*, upon the principles which influenced the Lord Chancellor in 1*st Atk.* 234, the complainant certainly has a right to resort to in this court, either on the ground of *surviving partner*, or as a *principal*, puting goods into the hands of a factor, which he had sold, and received notes for.

In defining a lien, it is contend·d, that there cannot, in the very nature of the case, be a lien on that which a man has not "*in custody*," for without custody *there is no lien.*

Let me ask, had the *Dumas's* in 1 *Atk.* 234, the custody of the bills which they indorsed over and remitted to the *Julians?* So far they had a possession, as the possession of a *factor* may be the possession of the principal. One reason which influenced the chancellor in that case was, that the bills were *appropriated*, when remitted, and were intended *to answer* a particular purpose.

So in the case before the court, the notes were put into the hands of P. & M. or suffered to remain in their custody, for the *express* and *particular* purpose of dividing the amount from time to time, as received, and not *for the separate* or sole use of P. & M.

It is also urged, that no lien, can exist when the parties have looked to *personal security, and relied upon it,* and 4 *Burr.* 2223 cited. The facts in that case were, that a dyer had, from time to time, dyed cloth for a clothier, which he had a right to retain till paid the expense of dying, but instead of a retainer he delivered up the cloth, *parted with his lien,* and relied on *the personal* credit of the clothier. Nothing similar to this appears in the case before the court, to shew that *Ridgely* parted with his interest in the concern on receiving P. & M's. notes; the contrary is expressly proved by *Levy,* to be the fact.

3. Let us now attend to the *third position* laid down by the defendant's counsel, viz. "that the right to demand "the possession of specific property depends upon the "circumstance, that he who demands the possession was "the *exclusive owner* and possessor, not having parted "with the right, or made any special agreement relin- "quishing the right."

In considering the observations made by the defendant's counsel on the third position, I shall agree with him, that when a factor makes a sale, and the property is converted *into money,* the first owner can only be esteemed a creditor, and is entitled to no preference; but if the case referred to by the Lord Chancellor in 1 *Atk.* had been attended to, the defendant's counsel must have been satisfied, that where *notes* instead of *money* had been given to the agent, the right of the principal to pursue them did not cease. A distinction is attempted to be set up between a possession as *part owner,* and a possession as factor, and that P. & M. being part owners, the property therefore in their hands could not be pursued; this objection, when duly considered, cannot possibly have any influence on the event of this case; because it is *contrary to the fact;* for *Levy* expressly proves, that the cargo came into P. & M's. hands as *agents for the* concern; and if they held as part owners, the right to the property, or its product *in notes,* certainly *survived* agreeably to the rules which prevail in all copartnerships.

The defendant's counsel has laid down a most extraordinary position, when he contends, "that where two "or more persons have a certain interest, and *one* of "them has the possession, and the property is sold, that "the relation of debtor and creditor is immediately

"created, and an action of assumpsit lies for his share
"or interest."

This is the first time I ever heard it asserted that an
action of assumpsit would lie by *one partner against ano-
ther*, for a copartnership transaction, before a *final set-
tlement* took place, and a balance struck.

What is the rule of law? Partners are seized *per mi
et per tout*; they are considered as joint tenants in the
stock, consequently nothing can be considered as the
*exclusive right*, or actual share of one partner, but his
proportion of *the residue, upon a balance being struck* of
the accounts between them.—*Law of Partn.* 116. One
joint partner cannot bring assumpsit against another,
nor trespass. The case referred to as an authority, (2
*Burr.* 936,) relates to a *factor*, and not to a *copartner*.

The cases cited from *Salk. Cowper, Doug. & Co. Litt.*
do not relate to a copartnership in trade, where the act
of one partner is the act of, and binding on, all; but to
a *joint tenancy*, where every one knows that an action at
law cannot be maintained by the *one* against *the other*.
For what purpose, these authorities were referred to, I
cannot possibly discover, as they relate not to the case
under consideration.

It is asserted, "that P. & M. by common consent, had
"the entire possession of the cargo for sale; their posses-
"sion was rightful; that *Ridgely* could not have deprived
"them of it against his *own agreement; that he could not
"have *followed the property*, and that by his own agree-
"ment he was to receive his share in money." These
assertions cannot be supported upon any mercantile prin-
ciple; for P. & M. *were only agents*, and held the pro-
perty as such; and it was liable in their hands to all the
operations of law, which prevail in cases between *factor*
and principal. *Ridgely* did not, by his own agreement,
agree to receive his share in *money*, and abandon his
rights either as *partner* or *principal*. No such proof ap-
pears in the cause; and if it did, according to the doc-
trine of the defendant's counsel, this consequence would
ensue, that the very moment the cargo was put into the
hands of P. & M. for sale, his *(Ridgely's)* right to a
*specific* remedy, ceased; and yet the defendant's counsel
admits, that *Ridgely's* right of *resorting* to the *specific* pro-
perty, continued till after the sale, and till he took P. &
M's notes.

It is urged, that *Ridgely* relied on the personal credit
of P. & M. and never thought he had a right to pursue
the notes; this assertion is contradicted by the proofs in
the cause for it is expressly ascertained, that the notes
were *not taken in payment* on a final settlement, but
only delivered as *evidence of the amount of sales;* and that

the reason why *each partner did not take notes* at the time of sale, from the purchasers, arose from the difficulty of apportioning the notes, and because the method was unusual.

It is also said, that "in cases of equity the hardship must be divided." Does the defendant's counsel intend by this to infer that persons no wise connected should contribute a portion of their property, that the hardship may be divided? If such is his idea, it may be *equality* indeed, but not *equity*, although the rule has been contended for, that *equality is equity*.

It is also advanced as a position, that "liens are clear legal rights," and as a remedy exists at law, equity ought not to interfere to swallow up the estate *for one creditor*. Is there any weight in this observation? Are there no cases of *liens in equity* that do not exist at law? Nay, when the lien at law has been parted with? What is the case of a person selling land, taking bond for the purchase money, conveying the land, and the purchaser then becoming bankrupt? Equity gives relief, (though law cannot,) and says, that the vendor shall be preferred to other creditors, *out of the land*.

Is it expected that equity will not interpose to prevent the estate of one person being swallowed up by claims against another, although it is assumed by the defendant's counsel, as an established point, that *all the creditors of P. & M. stand on the same footing*. Let me ask this single question, were all the creditors of P. & M. equally interested in the adventure to the West Indies? Where is the *justice* or *equity* that they should be satisfied debts against P. & M. out of *Ridgely's* property; or why should P. & M's share of the adventure be applied to their *private* debts, before the company's debts are *adjusted?* This would be reversing the law of merchants, and be destructive of commerce.

4. I come now to the *fourth* and *last position* of the defendant's counsel—"that copartners in general trade, or "a particular adventure, do not, as such, acquire the "relations of debtor and creditor, but that relation is "created whenever the adventure ends, and a balance is "struck and promised to be paid, or any special agree-"ment intervene on which a legal remedy can be had."

I readily admit, that the relation of debtor and creditor doth not arise between partners *till a balance is struck*, and promised to be paid. This is not the case before the court; the *contrary is the fact*, as *Levy's* deposition will fully prove. But I cannot help remarking, how contrary this concession is to the several cases cited, and to the several *dicta* there hazarded and insisted on by the defendant's counsel. In the preceding

part of his argument he insists that the complainant has a remedy at law, by action, as a joint tenant, he now relinquishes that point, and admits, that before one partner can sue another at law, *the partnership must be dissolved, and a balance struck.*

This is not the case before us; the partnership was *not dissolved;* for so long as the *risk was mutual, and continued,* the partnership could not *cease;* and no *final balance* could be agreed on. *The notes for the cargo* were at the *joint risk* of the concern, and consequently must be considered *as joint property.* What are the leading facts in 2 *T. R.* 479—a *dissolution of the copartnership,* a final *settlement* of accounts, and an *unconditional promise* to pay *the balance by the defendant;* neither of those three material facts exist in our case.

A difference is attempted to be set up between a person who sells land, and a person who sells personal chattels. I cannot discover any difference, for land cannot be followed in the hands of a third person, as a *purchaser,* no more than merchandize; but the case in *Atk.* surely proves, that notes arising from sales made by an agent, can be *pursued,* they having *ear-marks, which money has not,* and are therefore considered in the same light, as the goods for which they were sold. Bills remitted to a factor, while unpaid, are in the nature of goods *unsold,* and subject to such a lien as he may have against them—2 *Blk. Rep.* 1155. And I contend, the reverse of the position is equally true in favour of the principal, and that notes or bills taken for goods sold by a factor, are subject to the same liens as the goods themselves.

The case of 1 *Eq. Ab.* 142, *pl.* 14, cited by defendant's counsel, is not *recognized* by the court, in 1. *Bro. Chy.* 422. as stated; but an opinion is there announced directly to the contrary, as having been delivered by Lord *Hardwicke,* and also by Lord *Loughborough*—that where purchase money was unpaid, the estate purchased was liable by an equitable lien.

That case is also contradicted by the following authorities. 2 *Eq. Ab.* 682. 1 *Vern.* 267–8. 2 *Vez.* 622. 3 *Atk.* 272. 3 *P. Wms.* 307. 1 *Fonbl. Eq.* 143, 371, 374; but the cases in 1 *Eq. Ab.* 142, have been overruled by this court, in the decree *B. Wells against Charles Ridgely's* estate, (*a*) which decision hath given general satisfaction, and been the constant rule ever since in similar cases. The defendant's counsel relies on the agreement, that P. & M. were to *sell, collect* and *pay,* as a circumstance that destroyed

(*a*) See the case of the creditors of *Charles Ridgely* of *John* against his heirs and devisees May term 1792.

all right in *Ridgely* to resort to the property or notes specifically. Is it not the duty and office of every *agent to sell, collect and pay?*

The case of 1 *Atk.* 232, is not correctly stated by the defendant's counsel—*Dumas's* did not draw a second lot of bills to reimburse the first ones; they remitted bills drawn on another house, and *were indorsed over* by them to the *Julians, which completely changed the property.* Yet the defendant's counsel contends, that the great inquiry in that case was on the fact, *"is the property changed?"* Surely it was. Whenever *Dumas's* indorsed the bills over to the *Julians,* and they were received by the latter, the property in the bills, and the right to receive the contents, were not *in Dumas's,* but *out of them.*

The dfendant's counsel asserts, that notes taken in *the name* of the agent, for goods sold belonging to the *principal,* are to be considered as the property of the agent. This is denied to be a rule of law; it is contrary to *universal* usage among merchants, and the case referred to in 1 *Atk.* and already animadverted on, proves the contrary. Besides, if this position was true, an agent would be always liable for the amount of sales to his principal, where he had taken notes, although they proved insolvent. This would be making the agent *guarantee* all sales, and be an underwriter against all insolvencies; and this too, in the present case, where no commission was to be paid, for P. & M. were not to charge a commission; and yet according to the doctrine contended for, they were responsible to *Ridgely* for his part of *the gross amount of sales,* notwithstanding insolvencies; and notwithstanding the agreement of the parties was directly the reverse, as is expressly proved.

It is insisted, that as part owner *Ridgely* had no lien; I answer, that as *surviving* partner he had a right to pursue the notes, inasmuch as P. & M. were *agents,* and as such responsible to the concern, and as they took the notes for the *joint* account. and not for their separate use: It is contended, that to such part of the notes as were paid to P. & M. while living, the complainant's claim must sink to a *level with that of other creditors.* This I deny to be the rule in equity; for if we can find notes enough belonging to the concern, to pay *our proportion,* we have a right to pursue them. Suppose these had been paid out of the cargo on hand, when P. & M. died, could not *Ridgely* have taken possession of it as surviving partner, or would it have been appraised as P. & M's property by his executors? Certainly the surviving partner would have had the right; and in a court of equity, I contend, that inasmuch as part of the notes were on hand for which the cargo was sold, and can be de-

signated, we have a right to a decree that they should be set apart for that purpose. And the *reason* why *money* cannot be *pursued* specifically, arises, says the law books, because it has no *ear-marks* by which it can be designated.

The observations of the counsel for the defendant were to have been attended to, and answered by the *Attorney General;* but as he does not attend, I have therefore offered such arguments, as on a hasty consideration of the subject, appear pertinent. As the day is nearly arrived, being the 10th August, when *Carey* proposes to make a distribution, it is hoped the chancellor will be able to give a decree before that period.

HANSON, Chancellor. "The arguments of the defendant's counsel, against the decree in this cause passed, were by the chancellor heard and carefully considered; but he perceives nothing sufficient to overthrow the principles which governed him in his decision, or to prove that those principles were not justly applicable to the case. He cannot discover in what manner those principles can be injurious to commerce, or affect the negotiability of notes, as is intimated by the counsel. He has only determined, that the notes not negotiated in the lifetime of *M'Kenna,* shall be considered as in part the property of *Ridgely,* for whose use in part they were taken, and that the amount of the said *Ridgely's* part in the notes, which remained as aforesaid unnegotiated, shall be considered to be just so much as his share of all the notes taken in the name of *Parkin and M'Kenna* amounted to. Is there any thing in this to shew the chancellor's idea, that if A. sells the property of B. and takes a note for it, the note may not be negotiated as other notes? Is there any thing to shew his idea, that if a man holds any thing in secret trust, and disposes of it, as if he were the real owner, a fair purchaser may be disturbed in this court? No! the chancellor's idea goes no further than this—so long as the subject of an express or implied trust remains in the hands of the trustee, or of his heirs, executors, administrators or devisees, this court will lay hold of it, for the benefit of the *cestui que trust;* or if an executor, &c. converts it into money, this court will consider the money as justly belonging to the *cestui que trust;* and for rendering justice to him, will do any thing further not injurious to the creditors of the trustee; or (in other words,) not placing the creditors in a worse situation than they would have been in if the trust had never existed.

Will the chancellor's decision then tend in the least to destroy trust and confidence amongst men, or to injure the mercantile interest? Will it not rather have an

opposite effect? In short, after carefully consider-
ing the counsels observations, after attending to every
thing which learning and ingenuity could suggest against
his decision, the chancellor feels a much stronger assur-
ance that his decision is right, and that it will be appro-
ved by every judicious trader, not interested in the cause.

It is thereupon this, &c. adjudged, ordered and de-
creed, that the decree in this cause, passed on the, &c.
be and shall stand good."